May it please the court. I'm Bruce Fox, appearing for appellant Wally Lawson. I'd like to reserve six minutes for rebuttal and I'll keep track of my time. Your Honors, I'd like to... Yes? She just said go ahead. Okay. Your Honors, I'd like to address three issues this morning. First, the unusually suggested temporal proximity of the relevant events. Second, the myriad of factual issues appropriate for consideration by a jury. Third, the importance of the appellee's internal investigation of Moore and his formal written warning. If I may suggest, Your Honors, the mistinting impacts and colors everything in this case. The reality is this is the central fact of the case. I'd like to direct the court to the timeline I submitted yesterday. The sequence of events is highly suggestive of retaliatory intent by Mr. Moore. On April 21st, 2017, Lawson turned his boss in for unethical conduct. Then, during the week of April 24th, told him he wouldn't be part of it. And just about two weeks after that, on May 12th, Moore put Lawson on a performance improvement plan that led to his firing. Appellee hasn't shown... Let me stop you just a minute. I want to make sure on this timeline. It seems to me that we had a third market walk score that was prior to April. And we had a fourth market walk score. The unsuccessful fourth score was after April, right? That's correct, Your Honor. And so we had the first market walk score in October, the second marginal score after that, the third score unsuccessful after that. And then we have these events that happened in April. And then we had the fourth market walk score, right? And then he was put on the PIP. That's correct, although the April market walk has not been supplied as evidence. It's not part of the record, and we haven't seen it. So that's a disputed issue as to whether or not that market walk score is even out there, Your Honor. All right. So the third score was before April, and the fourth score was after April. That's correct, Your Honor. Okay. I just wanted to make sure as long as we were on timeline. Sure. Then he was put on PIP on May 12. Then he sent in his second complaint in June. Then the investigation started. Moore was told to quit and to tell his TMs to quit. And then in July, they had the fifth marginal score, which was fifth walk, which was a marginal score, right? That's correct, Your Honor. All right. Okay. So Pelley hasn't shown by clear and convincing evidence, as required by Section 1102.6, or even by preponderance, that Moore would have put Lawson on a PIP and then terminated him in the absence of Lawson's turning him in and defying his mistending directly. So a reasonable jury could find that Lawson's objection to the practice, at the very least, tipped the scale for Moore, even if there were some problems with Lawson's performance. There are clearly factual issues that flow from Moore's continued supervision of Lawson after he refused to follow Moore's directive. Even if this were a close case steeped with uncertainty about the events that led to Lawson's termination, which it most certainly is not, there's case law on this point. The case is Samson v. Wells Fargo. Counsel, may I ask you what? You invoke that clear and convincing evidence standard, suggesting that the employer had to establish by clear and convincing evidence that he would have been terminated for reasons entirely independent of any response to his protected conduct. Why do you assume that you're allowed to invoke that standard when you never suggested below that that was the standard? You seem quite content with the McDonald-Douglas standard. Isn't that so? Your Honor, we think that the plaintiff prevails under the application of either standard, but the argument has been made that we waive section 1102.5 by not expressly arguing it in the court below. But the matter is fully developed and is purely an issue of law. Why didn't you argue? You treated an appeal as so clearly the applicable standard. If it's so clear now, why wasn't it clear then? Because we were focused primarily on the facts in the brief, Your Honor, and it was not an issue that we raised. And at this point, we're raising it now, and that's the important thing. Policy concerns of waiver are mitigated because the issue is purely one of law. Public policy favors whistleblower suits. Counsel? They're vitally important. This is Judge Rawlinson. But the difficulty with that position is that if the employer had known that that was the standard, the employer could have ensured that it persuaded the judge that it had met that standard. It doesn't have the opportunity to do that now. Your Honor, it has the same evidence. We're relying upon the same evidence no matter which standard is applied. And the evidence that's submitted, whether the standard for determination is clear and convincing or pretext clear and convincing evidence that the action would have been taken anyways, the same evidence applies. So it wouldn't require the appellee to do anything differently by way of argument. What standard? Counselor, what standard do they use in California? Is it true that we really don't know what the standard should be given the California cases? Your Honor, it's very clear that the standard is, based upon the California cases, is the statutory standard. Well, but what about Patton? What about Moakler versus County of Orange? They both use the McDonnell Douglas standard. They're court of appeals cases. Well, yes, Your Honor, but Moakler relies upon Patton, and Patton predated the 2003 enactment of Section 1102.6. The California law says you apply the law in effect at the time of the review. And at the time of the review, they had 1102.6. But the statute became effective, as I understand it, Your Honor, on January 1, 2004. So any courts that applied McDonnell Douglas would be in effect ignoring California law. The California legislature made it very clear that they intended to apply a heightened standard for the defense of whistleblower claims. We've laid out the legislative history in our papers. So let me ask you this. With all this stuff that you've given me, why haven't you asked me to send this over to the California Supreme Court? It seems to me that we've got California courts applying 1102.6. We've got California courts, including the Court of Appeals, applying the McDonnell Douglas standard. And I'm saying it seems to me this is a great question for the California Supreme Court, and I don't know why you didn't ask me to do it. Your Honor, that may be an option to consider, but we believe that based upon the record, the court can deny summary judgment no matter which standard is applied. But just a minute. That can't be the answer because if I deny it based on whatever standards applied,  then it's not a fair question. I mean, the district court applied the McDonnell Douglas standard, and if, in fact, I can do it, whether it's 1102.6 or McDonnell Douglas, and I send it back, what's the district court going to do? Your Honor, the district court, it's our position, should apply the statutory standard because it's the companion but to be fair, it's only your position. It would be easier if we sent it over to the California Supreme Court and they told us what to do, wouldn't it? Yes, I understand your position, Your Honor. That may be an option, and I don't want to preclude that. If it's possible. Counsel, isn't it clear from your own experience with this case that you were not at all certain what standard applied given the way you proceeded in the district court and given the way that you're proceeding now, your own performance here suggests that there is real uncertainty about the standards that apply. Wouldn't it be useful to you and other litigants to have some certainty now about which standard applies? Your Honor, as I ponder it now, based upon your suggestion, I think you're right. I think it may be appropriate to have the California Supreme Court to address this issue to eliminate any uncertainty. Counsel, even if we do accept your argument that the government applied, that the court applied the wrong standard, why isn't that harmless? Well, it's possible, Your Honor, because the burden-shipping standard is much more difficult for an employer under the retaliation statute. It's possible that there could be a set of facts where the plaintiff would be unable to prevail under McDonnell-Douglas. There may be differing outcomes depending upon which standard is applied. Again, we believe that the facts are so egregious in this case, as outlined in our papers, that the application of either standard would require denial of a motion for summary judgment because there are factual issues in each case. Counsel, for instance, what was the evidence in the record that the people who were responsible for the termination knew that your client was the one who reported the misdeeds? Yes, Your Honor, the evidence in the record demonstrates that Moore was the principal decision-maker in putting Wally Lawson on a PIP and preparing his termination. He's the one who recommended it. He's the one who carried it out. He sat in on his termination. And Wally Lawson directly protested to Mr. Moore, told him that he wasn't going to engage in misconduct. He wasn't going to engage in illegality. He told it was wrong. It was stealing. He equated it to the John Dean scenario from Watergate. But he wasn't the only one who said that, though. There was no one who said it so directly and confrontationally, as did Mr. Lawson. And Mr. Moore reacted most significantly in a very agitated fashion. He cut Mr. Lawson short and told him to stop. He didn't want to hear it. And the testimony in the record is, Your Honor, that from that point forward, the relationship instantaneously deteriorated. There was a sea change. And it was Mr. Lawson's perception at that point that Mr. Moore was reacting very negatively to him. And then he proceeded within two weeks thereafter to put him on a performance improvement plan. That, Your Honor, suggests retaliatory intent as well as pretext. But is that clear and convincing evidence? Is that clear and convincing evidence, though? The burden is upon Kathleen to show by clear and convincing evidence. That's correct, Your Honor. And they cannot meet this burden under these facts. At the same time, the wrongdoer was being investigated. He lied to investigators. It was determined that he lied. And he was interviewed. This was in July in the time frame. And then he was allowed to continue to supervise Lawson with no oversight. And Lawson was terminated. And then most significantly further, Your Honor, TPG belatedly gave Moore a formal written warning telling him to refrain from penalizing TMs in the market walks and for not mistending, which is exactly what happened in this case. May I further? Counsel, you only have 25 seconds left. Okay, Your Honor. Thank you. Your Honor, Mr. Lawson was a whistleblower. He turned Mr. Moore in for illegal behavior. Appleby's motion ultimately relies upon Moore's testimony, his denial that Lawson's protected activity was a contributing factor. The jury could reasonably disbelieve all of Moore's testimony, all of his market walk scoring, his justification for the PIP and his justification for the firing. The position being advocated here would nullify the California legislature's clearly stated objective in enacting Section 1102.6. And we have requested the motion for summary judgment be denied. All right, Counsel. You've exceeded your time. I'll give you a minute for rebuttal. We're here now from Ms. Cogbill. Good morning, Your Honors. May it please the Court. Karen Cogbill on behalf of the Pele PPG. The district court's order granting summary judgment should be affirmed. Protected conduct does not grant an employee immunity from termination for poor performance that preceded the protected conduct and continued after the protected conduct. The crux of a retaliation claim is that the employer changes course after an employee engages in protected activity and changes the manner in which it measures the employee's performance as a result of the protected conduct. The district court properly found that Lawson failed to demonstrate that he was subjected to different treatments either as compared to his actions and performance before the protected activity or as compared to other territory managers. I'm having a tough time with that argument. I mean, it's a great way to start out, but I'm looking at the facts, and I'm having a tough time with it. I have a third score, which was unsuccessful before April. In April, Moore tells the TMs to intentionally mis-tempt the product. On April 18th, Mr. Lawson reports that to the ethics portal, and shortly thereafter, and I'm told now based on this timeline, the 24th, he speaks directly to Moore and tells him he's not going to do it, and that's not the way to do it. Then on the fourth score for the market walk, he's unsuccessful. Now, it seems to me between the third and the fourth, there's been this come, and then on May, they put on a PIP, and then there's a second complaint, and Moore's disciplined, and he's told to tell the TMS to stop, and then he gets a fifth marginal score. I'm having a tough time understanding why it's clear and convincing at all that there's no pretext. Well, Your Honor, it's important, I think, to back up and make sure that we're clear on what the record shows. I am measuring. I measured exactly. I had October, I had the second, I had the third, and then I came to April, and I had the fourth, and then I had what happened. I took them all. Your Honor, there's a December market walk of 60. There's a March market walk. There's an April market walk. The April market walk is not… Which we don't have in the record. Yes, we do. We have it in the record at ER 266. Mr. Lawson confirms there's a market walk. He confirms what his score is, and he confirms he's given a verbal warning. That all occurs on April 21st. Before that, we also have confirmation that there is a discussion to put on a PIP and an agreement to put on a PIP. This is all before any protected activity. It all sounds good, but when we're on summary judgment, I'm having a tough time understanding why that's a summary judgment standard. It's summary judgment, Your Honor, because there's no evidence of pretext. Well, there is evidence of pretext. Absolutely evidence. What has been cited as evidence of pretext is scoring. The scoring that Mr. Moore gave and did is consistent before any alleged protected activity and after any alleged protected activity. So we know that Mr. Lawson, the decision to place him on a PIP, is both because of market walks and because of missed sales performance. That all existed, and the decision to place him on a PIP… Well, I can understand you had a great argument on the second prong of McDonnell Douglas, but on pretext, I'm having a tough time understanding how you make it. We make it, Your Honor, because… On summary judgment. Yes, we make it because the evidence of pretext here is that the appellant has attempted to show pretext by showing that Lawson was treated differently after he engaged in protected activity. Well, he was. He was treated differently. Your Honor, with all due respect, he wasn't. I'm having a tough time. He goes from exceptional to unsuccessful on his third score, and then that fourth score doesn't change at all, and he's put on a PIP after he knows Moore, his supervisor, knows he's fighting him about what he's been told to do because it's deceptive. The decision to place Mr. Lawson on a PIP was made before any protected activity occurred. Excuse me. I mean, that's an important issue, but there's clearly a dispute of fact about that. It is your contention that the record supports the proposition that the decision was made to put him on a PIP before he engaged in protected conduct. He relies on evidence in the record of the contrary. I mean, that seems to me a classic instance of a very material disputed fact. Are you suggesting that the record is unmistakably clear on that issue? The record is unmistakably clear that the decision was made to place him on a PIP before he engaged in a protected activity. While the PIP itself was not delivered to him until May 12, the decision was made beforehand. Mr. Lawson has not offered any testimony which contradicts the testimony of both Mr. Mayhew as well as Mr. Moore, that that decision predates any alleged protected activity by Mr. Lawson. Further evidence, which is cited in our brief, at page 513 of the record, you will see that there is an email from Clarence Moore to Mr. Mayhew on April 26. This follows the April market walk, and this follows the verbal warning. This follows three scores from Mr. Moore that are substandard. It follows eight months of missing his sales goal. And Mr. Moore reaches out to Mr. Mayhew and says, can you call me to talk about the PIP? Mr. Mayhew responds and says that he's to talk to one of his colleagues. And I gave her a heads up based on what was discussed a couple of weeks ago. So there is no contrary evidence in the record that the decision to make to put Mr. Lawson on a PIP was not made until after the protected activity. Let me ask you about the way in which the PIP was carried out. There appears to be evidence in the record that Mr. Moore did not conduct that performance improvement plan consistent with company policy. He did not engage with Mr. Moore in the way that he was supposed to. And in fact, the only reason that plan was that improvement plan was extended for 30 days was because Mr. Moore did not carry out that plan the way in which he was supposed to, leading at least to an inference that he did not want Mr. Lawson to succeed under that improvement plan. Isn't there evidence in the record that supports that argument and that inference? There is evidence in the record that the PIP was extended for an additional 30 days. The evidence is in the record is that it was extended for an additional 30 days to allow Mr. Lawson an opportunity to be successful in completing the PIP. He had not yet met the goals of the PIP. He had not satisfied his sales numbers were not where they needed to be as defined in the PIP. And his marker walk score was also still not successful. So he was given an additional 30 days in order to be successful under the PIP. Thank you. Councilor? Councilor, sorry, I didn't mean to interrupt you, Joseph. No, please. Councilor, I hear you arguing your point of view on a summary judgment to the facts as you want them to be made. You're not looking at the facts as I have to take them on summary judgment and then making your argument. You go back to your general story that you'd like to make, and that's why I think that's a tough argument you're making. Maybe taking the facts as alleged by him, which my colleague has put out there, would be a better way for you to respond to. Your Honor, on summary judgment, the court does give a reasonable inference to the non-moving party, but that reasonable inference must be based on actual facts in the record. What the appellant has done is the appellant has lost pure speculation and conjecture as to what might exist. When we actually drill down to what is in the record, we see that Moore was consistent. So, for example, appellant takes issue with the fact that Moore gave all or nothing in scoring the market loss. So he should have maybe, instead of giving him five points in a category, he gave him zero, instead of giving him partial points. But what we see when we look at the market loss from December and March, which all unquestionably predate any protected activity, that is the exact same way that Mr. Moore scored Mr. Lawson. Let me change the emphasis here. I'm having a tough time why we should apply McDonnell-Douglas in California after 1102.6. It seems to me that having had 1102.6 enacted, that that's a different standard than the McDonnell-Douglas, and I don't know why the district court applied it. And therefore, raising it on appeal, finding it being a question of law as to what ought to be applied and what ought not to be applied, I'm having a tough time understanding why I shouldn't find out which standard I should apply. You know, there is no uncertainty or dispute amongst the California courts. They have all consistently applied McDonnell-Douglas on an 1102.5 summary judgment case post the announcement of 1102.6. More importantly, 1102.6 is an evidentiary standard for trial in a mixed motive case. So where we're in summary judgment... Where does it say in 1102.6 that it has anything to do with just mixed motive? It's the way that both the California courts and the jury... Just a minute, just a minute. I'm reading the statute. I hear what you said, and I heard your argument, and I looked at it, and I said, where do I find any language in 1102.6 that says this only applies in mixed motive? Your Honor, we know that it applies in mixed motive because it requires the plaintiff to show that 1102.5 was a contributing factor that leads to the termination. By demonstrating that there's a contributing factor that leads to the act of sanction, that then gives rise to the mixed motive. If we look at the jury instructions, so the jury instructions for 1102.5 plain, jury instruction 4603 clearly walks through the traditional... Wouldn't it be a good thing for me, since I read the language and don't find anything like that in there, to send this over to the California Supreme Court and find out if that's really what they're saying? Your Honor, it is certainly within your prerogative to send it to the Supreme Court. Why wouldn't we do it? Why wouldn't we do it? It doesn't need to be done, because it doesn't need to be done, because the California... Well, that's justified by your idea of it. But there's no... Every California appellate court that has issued a decision on 1102.5 has applied McDonald's Act. Counsel? Yes? Are you familiar with the recent California Court of Appeal decision of Willis v. City of Carlsbad? I believe, Your Honor... I believe I am, Your Honor, and that that is a... If I'm correct, that is a jury... That is a post-jury decision, not a summary judgment case. Right, but it also articulates how 1102.6 fits into the evidentiary framework, because the McDonnell-Douglas part is used. It appears from this opinion that the McDonnell-Douglas framework is used, and once that... Then the burden shifts to the employer to prove by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons, even if the employee had not engaged in activities protected by 1102.5. So, why isn't that clear evidence of how the California courts look at this burden? Your Honor, I think that is clear evidence, and I think that's consistent exactly with what we're saying, which is on summary judgment, you utilize McDonnell-Douglas. It's a tool by which the court can sort evidence into different buckets to figure out what truly is at issue. But you use McDonnell-Douglas only to see if the employee has a valid claim, and then once the employee has met his burden and the employer is going for independent reasons, the standard of proof shifts. That's what it looks like it's saying in this case. Your Honor, the standard of proof does not shift until the plaintiff or the employee shows that the protected conduct was a contributing factor that led... And that's under the language of 1102.6. 1102.6 says that the employee must show a contributing factor. Here, because on summary judgment, if the employee cannot show pretext, which is the case here, there's nothing to go to the jury. There's nothing by which the employee could show a contributing factor. On summary judgment, if he raised an issue of fact that is a contributing factor, then the employer has to show by clear and convincing evidence that the alleged action would have occurred. So he doesn't have to meet the ultimate burden of proof. He just has to show by raising an issue of fact on that. Your Honor, he actually has to show by the promise of evidence that it would be a contributing factor. That would be his burden. If the court were to apply 1102.6 on summary judgment, he would have to show that his protected conduct was a contributing factor. You're making an argument that I don't think I've ever quite heard before. You seem to be saying that there are different analytical frameworks that apply at summary judgment and at trial in terms of who has the burden of proof on these issues. I thought the whole purpose of summary judgment was to try to figure out how these issues will play out at trial. And the whole purpose of summary judgment would be defeated if you have one standard for summary judgment, one analytical framework for summary judgment and a completely different one at trial. Is that what you're saying the law is? Your Honor, I see I'm going to go over my time. Let me, if I may, answer your question. And that's not exactly what I'm saying. But what we know consistently that when the McDonnell Douglas test is applied, that that is where there is burden shifting. We know that under a FIHA claim, for example, when that claim goes to trial, the ultimate burden of proof continues to remain with the plaintiff. So, yes, there are instances where at summary judgment under McDonnell Douglas, there would be this burden shifting that would not exist at trial because, again, at trial, the ultimate burden is with the plaintiff. Here, Your Honor, just in closing, what I would say is the evidentiary record, what the appellant has argued is a misstatement of the timeline of events. It also fails to, the appellant has also not shown that there is any change of course or that Mr. Lawson was treated any differently before or after he engaged in protective activities. And more importantly, there is no evidence of any comparison, right, that any other employee, that Mr. Lawson was treated in any other manner that was different than how Mr. Moore treated one, any other employee. So unless the court has any further questions, I will submit. Thank you, counsel. Rebuttal, one minute. Yes, Your Honor. I just want to note that we cite in our brief three federal district court cases in California that consistently apply California Labor Code Section 1102.5's clear and convincing evidence standard. The Canoop case in 2016, the Mango case in 2012, and the Owl case in 2015. We think there is tremendous evidence of pretext in this case as well as retaliatory intent, especially given the fact that Wally Lawson's antagonist Clarence Moore was found to have been lying during the course of the investigation. The investigators concluded that he had lied, yet he was still allowed to supervise Lawson only after Lawson was terminated was a letter issued disciplining him and telling him he could not continue to misgrade or to penalize his territory managers based upon whether they mistended. He's still with the company. Lawson was fired. We think a jury would find those facts to be very significant and strongly suggested the pretext and retaliatory intent based upon this fact pattern, based upon the highly suspicious sequence of events in which it was very clear an argument could be made. The court has to accept Lawson's testimony on these points that the PIP was completely invalid and the court has to credit this. We understand your argument, counsel. You've exceeded your time. Thank you. Okay, thank you very much, Your Honor. The case just argued is submitted for decision by the court that completes our calendar for the morning. We are on recess until 9.30 a.m. tomorrow morning. This court for this session stands adjourned.
judges: Lipez, Rawlinson, N.R. Smith